**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| SANDY HERRIN, Individually and as the Executrix of THE ESTATE OF RICHARD LEE McATEE, | § § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 7:03-cv-0259-R |
| ROBERT TREON, GARY JOHNSON, PAUL TAYLOR, RICHARD WILLIAMS, JAMES BLANFORD, SUSAN LANCASTER, TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER, | § § § § § § § § | |
| Defendants. | § | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

**FILED**
October 10, 2006

CLERK, U.S. DISTRICT COURT

## MEMORANDUM OPINION AND ORDER

Now before the Court are Defendants Blanford, Williams, Taylor, Treon, and Johnson's motions for summary judgment. (Dkt. No. 49). For the reasons explained below, the Court **GRANTS** Defendants Treon and Johnson's motions for summary judgment but **DENIES** Defendants Williams, Blanford, and Taylor's motions for summary judgment in part.

## I. BACKGROUND

This case arises out of a prison death. On June 3, 2002, Richard Lee McAtee was 18 years old. He began serving a 10-year criminal sentence at the Allred Unit, a Texas state prison in Iowa Park, Texas. On June 19, 2003, he was placed in administrative segregation (Ad Seg) at the direction of prison staff. He killed himself shortly after, the victim of an apparent suicide by

1

hanging.

The only remaining witnesses to the suicide are prison officials.  It is from the reports and depositions of various prison employees that the Court has attempted to discern what happened in the short period of time between McAtee's transfer to the Ad Seg unit and the time that a doctor officially pronounced McAtee dead. The evidence before the Court generally confirms that two prison guards, Officers Richard Williams and James Blanford, saw McAtee shortly after arriving in Ad Seg.  He was angry – yelling and moving around his cell, refusing to put on his Ad Seg jumper. At some point, one of the officers called for a supervisor – that is when the stories diverge in legally significant ways.

Although the supervisor, Sergeant Paul Taylor, claims he arrived at McAtee's cell, saw him hang himself, ordered the door to McAtee's cell be "rolled" so that he and the other officers could enter the cell, and immediately called for medical personnel, Nurse Susan Lancaster, the first and only medical professional to arrive cellside found that McAtee was not breathing, had no pulse, and his body was cool to the touch.

Plaintiff Sandy Herrin, McAtee's mother and the executrix of his estate, is suing Robert Treon, Gary Johnson, Paul Taylor, Richard Williams, James Blanford, Susan Lancaster, and Texas Tech University Health Sciences Center.

Defendants present rough approximations of what they allege to be the "undisputed" facts of the case.  Herrin disputes all of the factual allegations made by Defendants. Upon closer examination, many of the facts that are alleged to be undisputed are anything but.  Instead, the evidence surrounding McAtee's death is highly circumstantial, hotly contested, inherently contradictory, and obviously inconclusive.  In many instances, the testimony of several witnesses

– either by deposition or otherwise – varies significantly from either their prior testimony or the testimony of other witnesses in the record, including other sworn voluntary statements and the various unsworn incident reports that were prepared shortly after McAtee died.  For that reason, the Court believes that several reasonable, competing inferences may be drawn from the evidence in this case which must necessarily be resolved in favor of the nonmovant.  Because of the exceptional nature of this case, the remarkably inconsistent evidence in the record, and the eerie uncertainty about the circumstances of McAtee's death, several of the motions for summary judgment now before the Court cannot be resolved in Defendants' favor on the inconclusive and contradictory evidentiary record that was submitted in conjunction with these motions.

As shown below, the Court finds that Warden Robert Treon and TDCJ Executive Director Gary Johnson are entitled to summary judgment on all of Plaintiff's claims.  By contrast, the Court finds that, as to the other movants – Officer Paul Williams, Officer James Blanford, and Sergeant Paul Taylor – several genuine issues of material fact remain unresolved constraining the Court from deciding, at this juncture, that these Defendants are entitled to qualified immunity.  For this reason, the Court denies these Defendants' motions for summary judgment.

### A.   McAtee's Institutional History and Functioning

McAtee suffered from severe psychological and developmental disorders when he first arrived at the Allred Unit.  During his intake interview, he informed prison officials that he had a severe bowel disorder that rendered him fecally incontinent.  He also  informed prison officials that he had contemplated suicide in the past and that his most recent suicidal ideation had occurred when he was 17, shortly before his criminal trial.  After speaking with the intake interviewer and the

chaplain on staff, McAtee was immediately placed on suicide watch. He was also given bottom bunk privileges and "Depends" adult diapers to wear because of his incontinence. Prison psychiatrists diagnosed him as suffering from clinical depression. He was then placed on antidepressants and was eventually released into the general prison population.

McAtee was involved in several minor disciplinary infractions during his brief time at the Allred Unit. The evidence before the Court suggests that many of those incidents involved altercations with cellmates who McAtee claimed were attacking him or sexually abusing him, or with medical staff, who, at times, denied his requests for Depends when he refused to submit to a rectal exam. McAtee was also frequently cited for destroying his wristbands.

Most significantly, McAtee was written-up for three "assaults" on officers. These incidents served as the basis for the final decision to send him to Ad Seg, where he died. The first incident occurred on November 5, 2002 when McAtee struck a passing guard on his shoulder from inside his cell. The author of McAtee's psychological autopsy report speculates that this may have been a deliberate attempt to be moved to another cell. As a result of that incident, McAtee was given 15 days of solitary confinement. He made a 3" cut to his wrist the day after he was sent to serve his disciplinary sentence. The second reported assault occurred in early May 2003 when McAtee refused to submit to a strip search. McAtee reportedly climbed atop his bunk and threw a shampoo bottle at a guard, striking him in the leg. The final incident occurred on May 29 when McAtee threw a cup of water at an officer. Although his  psychologist described the incident as yet another deliberate attempt to be moved from his cell, McAtee was once again cited for assaulting an officer. These three assaults served as the basis for placement in Ad Seg with the "worst of the worst" offenders.

4

According to the Psychological Autopsy Report, placement in Ad Seg "appears to have been the stimulus that made death seem preferable to [McAtee] over interminable fear and pain and humiliation." When he reached the Allred Unit, McAtee "had virtually every possible strike against him: . . . he was a small (5'6" tall, 130 lbs.), weak, illegitimate, immature teen who wore diapers, cried and messed himself, and was labeled as a child molester. His intellect, physique, and fund of coping skills were all totally inadequate for maximum security prison survival – and he knew it and was terrified."

### B.    McAtee's Death

McAtee met with an Allred Unit psychologist on the morning of June 19th. According to McAtee's psychological autopsy report, the psychiatrist who met with him that morning concluded that he was not psychotic and was not suffering from a major depressive episode. The psychologist did, however, report that McAtee told him the following: "I am doing fine. I have not been able to get help from the guards. I am being terrorized by other inmates." Shortly thereafter, at approximately 10:15 a.m., McAtee visited the medical department of the Allred Unit, after having made a sick call request two days earlier for constipation. McAtee was treated without incident.

Later that day, Captain J.C. Boyle reported to the Allred Unit Administrative Segregation Committee that McAtee was a threat to the physical safety of the Allred staff and other prisoners given his three prior assaults on officers. The committee concurred and decided to reassign McAtee to Ad Seg. McAtee was not present when this decision was made.

At approximately 5:00 p.m. (about one hour before he hung himself), McAtee was escorted with 10 other prisoners to the medical unit for a pre-segregation physical exam. While waiting for

the examinations, a group of security officers entered the infirmary and began yelling at the offenders to get on their knees and submit to restraints.  At this time, McAtee was told that he was to be sent to Ad Seg.  As he was escorted out of the infirmary, McAtee began threatening to kill himself if was sent to Ad Seg.  According to one nurse who as at the scene, McAtee was screaming, "If you put me over there, I'm gonna kill myself!"[1]

The facts begin to conflict after McAtee was sent to Ad Seg.  The most telling acknowledgment of the factual disparities is in the Psychological Autopsy Report prepared by the State after McAtee's death.  In it, the report's author describes what happened after Sergeant Taylor and other guards arrived at McAtee's cell with the following disclaimer: "At this point there is some discrepancy between the EAC report sent by Sgt. Taylor and the medical record report provided by Ms. Lancaster, so some of what follows is therefore uncertain."   The following is a brief summary of those events, as recounted by several defendants and witnesses and contained in the Appendix to the parties' summary judgment joint submission:

### 1.        Officer Blanford's Story

Officers Richard Williams and James Blanford were the correctional officers assigned to monitor McAtee's section of the Ad Seg unit (the "E-pod") when he died.  Both officers have completed unsworn witness statements for Warden Treon and sworn witness statements for the Office of the Inspector General (OIG).

In his sworn statement to the OIG, Officer Blanford states the following: "I . . . at approximately 1815 [6:15 p.m.] approached 12EB-22 cell.  At that time offender McAtee . . . was

---

[1]The guard who overheard these threats but who nevertheless escorted McAtee to administrative segregation – Officer Nunez – was not named as a defendant in the lawsuit.

alive and banging on his cell door. [Officer] Williams then told [Officer] Rubenzer to call for rank. *In the process of him calling for rank, offender placed a noose around his neck.* I . . . could not determine whether or not the offender was standing on his feet because of his sink and toilet obstructing my view. Approximately 2 minutes later, rank arrived . . . ." (Emphasis added.)

At that point, Officer Blanford claims that Sergeant Taylor took over the scene and tried to get McAtee to take the noose off his neck. "Sgt. Williams opened the food slot and hit around with a bean tool to try and get a response." Approximately 1 to 2 minutes later Sergeant Taylor decided to enter the cell "to cut down the offender . . . . We placed the offender on the floor and I . . . untied the knot from around his neck. . . . When I got the knot loose, medical entered the cell and conducted an inspection of the offender and then ordered us to move the offender to the runs." Nurse Lancaster then inspected McAtee again and escorted him to the emergency room in 10 Building.

### 2.      *Officer Williams's Story*

In his sworn OIG statement, Officer Williams states that he confronted McAtee at approximately 6:12 p.m. McAtee was banging, kicking and shouting, "I'm mad! I'm fucking this shit all up!" Officer Williams then called "for a supervisor through the picket boss[2] . . . Rubenzer. . . . Upon looking back into the cell [McAtee] went to the sink and placed a noose over his neck. I immediately called the picket telling him, '[G]et help now he['s] going to hang.'"

Officer Williams claims that Sergeant Taylor arrived within 2 minutes and took over the situation. "I cannot recall what [Sergeant Taylor] was saying to [McAtee] or if [McAtee]

---

[2]The "picket officer" is a officer positioned inside the control room who operates the doors inside the unit. According to Sergeant Taylor's testimony, the picket officer is positioned to see "everyone" in the cell block.

responded as I was away from [the cell]."  About a minute after Sergeant Taylor's arrival, Taylor

ordered the guards to enter the cell. Upon entering the cell, Taylor applied hand restraints and

ordered Officer Williams to cut the noose from the vent.

In his unsworn report to Warden Treon, Officer Williams added a few details not in his

OIG statement.  When Officer Williams first saw the noose McAtee used to hang himself, he

described it as a "noose made from a sheet."  Officer Williams also confirmed that when he cut

McAtee down from the vent, McAtee was placed on the floor.  Nurse Lancaster then arrived,

entered the cell, and ordered the staff to move McAtee to the run in front of his cell.

Officer Williams was also deposed on January 19, 2005. At his deposition, Officer

Williams testified that after telling Officer Rubenzer to call a supervisor the first time, he left to

the other end of the  "run"[3] to speak to another inmate for about a minute to a minute and a half.

When Officer Williams returned to McAtee's cell he saw that McAtee was in the corner of his

cell, facing away from him, hands around his neck, with a ligature tied around his neck.  Unlike

in his earlier statement to Warden Treon, in his deposition, Officer Williams claimed that he did

not know whether the ligature was a cloth or a sheet.

Officer Williams claims that he shouted to the picket officer, Officer Rubenzer, that

McAtee was attempting to hang himself.  Williams claims that he instructed McAtee to stand up

and remove the ligature.  He also claims to have told McAtee that he would not enter the cell to

save him.  Williams later explained that TDCJ has an express policy of not permitting floor

officers to enter an Ad Seg unit for any reason unless the officer has the express approval of a

supervisor.  The policy also requires that a team of officers be assembled before entering a cell in

---

[3]The "run" is the term used by prison employees to refer to the walkway in front of the cells.

Ad Seg.  For that reason, Officer Williams states that he told the picket officer McAtee was

hanging and to immediately summon a supervisor.

Williams claims that Sergeant Taylor, Sergeant (Jayson) Williams, and other correctional

officers arrived shortly thereafter. They entered McAtee's cell, and Officer Williams cut him

down.  Officer Williams did not believe that McAtee was dead when they cut him down.  Officer

Williams remembers that his body was warm, "very warm."  Instead of placing McAtee's body

on the floor, as Officer Williams and Officer Blanford reported in their sworn OIG statements,

later in his deposition, Williams that McAtee's body was placed on the bed.


### 3.     *Sergeant Taylor's Story*

In Sergeant Taylor's sworn OIG statement, he claims to have responded to a call that an

offender on E-Pod was "attempting to hang himself."  Taylor makes no mention of an earlier

non-emergency call to McAtee's cell.  Taylor claims that when he arrived at McAtee's cell, "we

observed offender McAtee . . . with a state sheet tied around his neck and the other end secured

to the air vent. . . . [McAtee] appeared to be holding his neck away from the noose with his

hands."  Taylor ordered McAtee to remove the sheet from his neck.  McAtee "refused to obey

the order and stated 'hell no, I'm going to do it.'"  Taylor claims that at that moment McAtee

"removed his hands and dropped his neck into the noose."

Taylor's statement differs significantly from Officers Blanford and Williams who claim

that McAtee's back was to them and that they could not see his face.  No other witness but

Taylor and Officer Scott claim to have heard McAtee speak or to have seen him drop his neck

into the noose.  Officer Scott, who also responded to a call for additional staff, says he saw "Sgt.

Taylor [give] orders for [McAtee] to submit to hand restraints and [McAtee] verbally refused, then dropped from the side of the toilet." Unlike Officer Scott though, Sergeant Taylor claimed in his deposition that "[McAtee] didn't jump from the toilet, he wasn't even on the toilet."

Taylor claims after seeing McAtee drop into the noose, he immediately ordered the door to McAtee's cell "rolled open." He placed hand restraints on McAtee and ordered Officer Williams to cut the sheet down from the vent. Unlike the other witnesses, Taylor claims that McAtee was immediately carried out to the run. Contradicting Officer Williams's statement, Taylor said he then ordered a video camera (Williams claimed that the camera arrived before they entered the cell). In Taylor's story, Nurse Lancaster arrived at about 6:18 p.m., evaluated McAtee, and ordered him sent to the medical unit – presumably while McAtee was in the run.

### 4.      *Officer Rubenzer's Story*

Officer Rubenzer was the picket officer at about 6:15 p.m. on the day of McAtee's death. He claims that when Officer Williams called him over the speaker, Williams told him to "call for rank because [McAtee] *had hung himself.*" (Emphasis added.) Contrary to Williams's depiction of calling for an *attempted* hanging, Rubenzer understood that McAtee had *already hung* himself. Rubenzer also claims to have first made the call for rank at 6:20 p.m., 5 minutes after Taylor clams to have been called and 2 minutes after Taylor, Williams, and Blanford claim that Nurse Lancaster arrived.

### 5.      *Nurse Lancaster's Story*

Nurse Susan Lancaster, arrived at McAtee's cell after he hung himself.  In a handwritten sworn statement provided to the OIG, she reports, "At approx. 1810 [6:10 p.m.] security called for a nurse in the 12 bldg. stating that they had an [inmate] *threatening* to hang himself." (Emphasis added).[4]  Lancaster claims that when she received "the message or the phone call," she was "seven to eight minutes" away from McAtee's cell and had to pass through approximately seven locked gates to get to the cell.

Contradicting the stories of the other staff members present, Lancaster claims that when she arrived at the cell, she saw McAtee in his boxer shorts, in a "semi kneeling position, hands cuffed behind his back, face down, his torso leaning up/over the bunk."   Lancaster claims that she asked security to turn McAtee over for inspection.  When they did, she saw that his face was cyanotic around the mouth and his pupils were "widely dilated" and "nonresponsive to light/touch."  Contradicting Officer Williams's account, Lancaster claims that McAtee was not breathing, he had no pulse, and his body was "*cool to the touch*."  (Emphasis added.) Additionally, she observed clear fluids oozing from his nose and mouth and noted that he had soiled his boxer shorts.  The front of his neck bore a large ligature mark.  Lancaster "does not recall" seeing a chair, rope, bedsheet, or "extra piece of cloth" in McAtee's cell.

Lancaster claims that no one attempted to give McAtee CPR at the scene.  She claims that she did not commence CPR because she did not have a protective mouth shield and was unable to locate one.  She reportedly told officers at the scene, "I won't breathe for him," meaning that she refused to commence mouth-to-mouth resuscitation without protection. Lancaster also testified in her deposition that she did not perform CPR on McAtee immediately

---

[4]Lancaster also notes in McAtee's clinical records from TDCJ that she was called to building 12 for a "Threatened hanging."  (Pl.'s App. 11).  The word "Threatened" is capitalized in her own handwriting.

because she thought he was dead when she arrived at his cell.

McAtee was then taken to the emergency room in Building 10.  According to Lancaster, "[s]ecurity assisted" in getting McAtee to the emergency room in Building 10 and calling-in other nurses – Neuman and Huff – from break.  In her report, she states that "CPR was not started until an ambu bag was located [and] used."[5]  When asked at her deposition why she did not take a mouth shield with her when she responded to the initial call, she testified that she only did so "[b]ecause the *message or the phone call* [she] received said that he was *threatening* to hang himself."

Amy Newman, the R.N. who assisted in performing CPR on McAtee once in the ER, claimed that McAtee was "pale in color" and "cool to the touch" when he arrived at the ER.  She also claims that an officer at McAtee's gurney stated that "we had a weak pulse earlier," contradicting Nurse Lancaster's deposition testimony that McAtee had no signs of life when she arrived.

### 6.      *Summary of the Inconsistencies*

Upon the evidence presented in the summary judgment submissions, the Court cannot determine even the must rudimentary facts surrounding McAtee's death.  First, witnesses and reports fail to agree on the method of hanging – whether McAtee jumped from a toilet, the bed, or a chair (although no chair was in the cell).  Although one witness says that McAtee jumped from the toilet, Sergeant Taylor disagreed.  The other witnesses give no explanation about how

---

[5]An "ambu bag" is a manual resuscitator that is used to provide artificial ventilation to medical patients with breathing difficulties.  The device is used to introduce air into the lungs by means of a rubber squeeze bag attached to a face mask.

McAtee was able to get himself into a position to actually hang from the ceiling vent.

Witnesses and reports also disagree about what instrument was used to hang McAtee. The autopsy report claims a rope was used; other witnesses claim that either a sheet or a piece of cloth was used.  The prison staff evidently did not preserve the instrument of death.

The witnesses disagree about whether McAtee's back or his face was to the guards. Although Officers Williams and Blanford claimed not to be able to see McAtee's face, Sergeant Taylor not only claims to have seen his face, but also says he saw McAtee's lips moving when McAtee spoke to Taylor.

Most disturbing and also legally significant are the divergent views about the timeline relevant to McAtee's attempt to hang himself and the arrival of medical assistance.  First, Officer Williams claims that when he first called for assistance McAtee was merely belligerent, not suicidal.  However, Officer Rubenzer only recalls one call to a supervisor in which McAtee had already hung himself.  Sergeant Taylor said he responded to an *attempted hanging*.  Nurse Lancaster also responded to a *threatened hanging*.

The next point of disagreement comes over where the body was placed when it was cut down.  Some guards say the body was placed on the cell floor, Sergeant Taylor said the body was immediately taken to the run outside the cell, and Nurse Lancaster said the body was laying over the bed in the cell when she arrived.  But more importantly, the witnesses disagree over the state of the body when the guards cut McAtee down.  Some guards say he was alive, breathing, very warm to the touch, and had a weak pulse.  Yet, when Nurse Lancaster arrived, only minutes later, McAtee was dead.  His face was cyanotic around the mouth with clear fluids oozing from it.  His body, according to Nurse Lancaster, was cool to the touch.

13

Perhaps more disturbing than the factual discrepancies are the omissions in the evidence submitted to the Court. Defendants present a rather remarkable story that guards witnessed McAtee's suicide attempt, that none of them can explain how he hung himself from the ceiling vent, that at one moment he was talking with a guard, and that the next moment he slid his neck into a noose and instantly died with no struggle. The Defendants present a story where everyone reacted instantaneously to the threatened suicide yet when McAtee was cut down from the vents, only minutes later his body was cold and he was nonresponsive. On this contradictory and incomplete factual record, credibility determinations are paramount.

## II.  ANALYSIS

Defendants have moved for summary judgment on several issues. Foremost, Defendants argue that they are each entitled to qualified immunity on Plaintiff's constitutional claims. They also contend that they are entitled to summary judgment on Plaintiff's state law claims. In response, Plaintiff asserts that, based on the evidentiary record before the Court, summary judgment on the issue of qualified immunity is not appropriate at this time. Plaintiff has not responded to Defendants' motions for summary judgment on her state law claims.

### A.    Summary Judgment Standard

Summary judgment is appropriate under Rule 56 (c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact in the case and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

322, (1986); *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998).  Where the non-movant bears the burden of proof on a claim upon which summary judgment is sought, the movant may also discharge its initial burden by showing that there is an absence of evidence to support the nonmoving party's case.  *See Celotex*, 477 U.S. at 325.  Once the movant has met its initial burden, the non-movant must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431-32 (5th Cir. 1998). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

When weighing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and inferences in the light most favorable to the non-movant.  *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988); *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 640 (5th Cir. 1985).  "[A] court 'should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 492 (5th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000)) (emphasis added).  "Credibility determinations,

the weighing of the evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

### B.      Plaintiff's Claims Under 42 U.S.C. § 1983

### 1.      Qualified Immunity

The doctrine of qualified immunity shields government employees who are performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001). To properly invoke the defense of qualified immunity, a government official must show that the challenged conduct occurred while he or she was acting in his or her official capacity and that such action was within the scope of his or her discretionary authority. *Beltran v. City of El Paso*, 367 F.3d 299, 303 (5th Cir. 2004). Once a defendant has properly invoked the defense of qualified immunity, the plaintiff bears the burden of establishing that the defendant-official is not entitled to qualified immunity before the case can proceed any further. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (*en banc*).

A court must evaluate a qualified immunity defense in proper sequence. The threshold question is whether, on the plaintiff's version of the facts, the officer's conduct violated a currently-existing constitutional right. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per

16

curiam) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)).

If the plaintiff fails to allege a constitutional violation, then the defendant is entitled to qualified immunity and the court need not inquire any further. *Saucier*, 533 U.S. at 201. If, however, the plaintiff has shown a violation of a constitutional right, the court must then determine whether the defendant's actions were "objectively reasonable" in light of "clearly established law" at the time of the alleged violation. *Id.*; *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001).

The requirement that the law in question be clearly established is designed to ensure that officers have fair notice of proscribed conduct. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). As the Supreme Court has explained, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson*, 526 U.S. at 615). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope*, 536 U.S. at 739 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535, n.12 (1985) and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Prior cases involving "fundamentally similar" or "materially similar" facts can provide especially strong support for a conclusion that the law is clearly established, however, they are not necessary to such a finding. *Hope*, 536 U.S. at 741. In this regard, "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. "The law can be clearly established even without prior cases that are on all fours with the present case, 'so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Johnson v. Johnson*, 385 F.3d 503, 525-26 (5th Cir. 2004) (quoting *Hope*, 536 U.S. at 740).

17

## 2. Clearly Established Constitutional Violation

The Court must now determine if Plaintiff has alleged a violation of a constitutional right. *Brosseau*, 543 U.S. at 197.  Plaintiff claims that Officers Williams and Blanford, Sergeant Taylor, Warden Treon, and TDCJ Executive Director Johnson each violated McAtee's rights under the Eighth and Fourteenth Amendments.  She also contends that the officers' conduct interfered with her rights as a parent under the Fourteenth Amendment.

After carefully scrutinizing the most recent complaint filed in this case – Plaintiff's Third Amended Complaint – the Court has discerned seven alleged constitutional violations.  Plaintiff contends that Defendants Williams, Blanford, Taylor, Treon and Johnson violated McAtee's rights under the Eighth and Fourteenth Amendments by (1) failing to protect him from a known risk of death from suicide by placing him in an administrative segregation cell that was also improperly-equipped with the dangerous instrumentalities that he used to kill himself; (2) failing to remove those objects when it became apparent that he was suicidal; and (3) failing to properly react to abate the risk of suicide once they discovered that McAtee was either hanging or attempting to hang himself.  Additionally, Plaintiff claims that Defendants violated McAtee's constitutional rights by (4) promulgating, enforcing, or complying with the TDCJ do-not-enter policy, a policy which, she argues, is constitutionally deficient because it does not permit officers any discretion to enter a cell to rescue an inmate during an attempted suicide, even when the officer knows that the inmate is near death and may be rescued without peril.  Plaintiff also claims that (5) Defendants Taylor, Treon, and Johnson failed to adequately supervise and train their subordinates which resulted in a deprivation of McAtee's constitutional rights.  In the alternative, Plaintiff alleges that (6) Defendants intentionally murdered McAtee.  Lastly, she argues that (7) Defendants violated her substantive due

process rights to family relations by causing her son's death.   Plaintiff argues that these constitutional rights derive from the Eighth Amendment prohibition on cruel and unusual punishment and the Fourteenth Amendment's due process clause.

### a.      Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment imposes certain duties and obligations on prison officials.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Those duties and obligations include "humane conditions of confinement, . . . adequate food, clothing, shelter, and medical care, and . . . reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).   Clearly the government has an "obligation to provide medical care for those whom it is punishing by incarceration."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  Two elements must be satisfied to show that a prison official violated a prisoner's Eighth Amendment right: the alleged deprivation is "sufficiently serious" and a prison official is deliberately indifferent.  *Farmer,* 511 U.S. at 834.  "Deliberate indifference" is established where a prison official subjectively knows that an inmate faces "a substantial risk of serious harm" but nevertheless "fails to take reasonable measures" to protect the inmate from risk. *Id.* at 847; *Hare v. City of Corinth,* 74 F.3d 633, 650 (5th Cir. 1996) (*en banc*).

In the Fifth Circuit, the medical care requirement established in *Estelle* includes both physical and psychological injuries.  "Deliberate indifference" to either a serious physical injury or a "failure to take the steps necessary to protect against a detainee's suicidal tendencies" may result in a due process violation.  *Burns v. City of Galveston,* 905 F.2d 100, 103 (5th Cir. 1990) (citing *Partridge v. Two Unknown Police Officers of City of Houston*, 791 F.2d 1182 (5th Cir. 1986).  For

example, both a "failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care . . . [and] a failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation under *Bell v. Wolfish*." *Partridge*, 791, F.2d at 1187.   In the Fifth Circuit, prison officials owe a constitutional duty to protect a prisoner with known or obvious suicidal tendencies from self-inflicted harm.  *See Jacobs v. West Feliciana Sheriff's Dept.*, 228 F.3d 388, 394 (5th Cir. 2000); *Flores v. Hardeman County*, 124 F.3d 736 (5th Cir. 1997) (citing *Hare v. City of Corinth*, 74 F.3d. at 644).

Deliberate indifference as applied to medical care can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle* 429 U.S. at 104-105.  This delay, however, "can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842.  So a prison official must show that he or she was "unaware even of an obvious risk to inmate health or safety." *Id.* at 844.

In the present case, there are sufficient factual inconsistencies that could lead a jury to conclude that the officers were deliberately indifferent to McAtee's need for medical attention. These inconsistencies include (1) when the guards first saw a noose around McAtee's neck; (2) when a call for a supervisor was made; (3) what was said in the call for a supervisor; (4) the time of arrival of a supervisor; (5) at what point guards actually entered McAtee's cell; (6) at what time medical personnel were called and arrived (7) McAtee's body temperature at arrival of first medical

20

personnel; and more generally (8) when McAtee actually died and in what manner.

Assuming the truth of the allegations in her complaint, the Court finds that Plaintiff has properly alleged several violations of the Eighth Amendment. As mentioned previously, a prison official may be liable for deliberate indifference by failing to take reasonable measures to protect an inmate from a known or obvious substantial risk of serious harm. This includes, as Plaintiff alleges, failing to protect an inmate from a known or obvious risk of suicide; placing the inmate in an improperly-equipped cell, in conscious disregard the inmate's known or obvious self-destructive tendencies; failing to remove dangerous objects when it is apparent that an inmate is imminently suicidal; *and failing to properly react when discovering that an inmate is either hanging or attempting to hang himself*. Plaintiff also alleges an Eighth Amendment claim that Defendants acted with deliberate indifference to McAtee's medical needs by promulgating and enforcing prison policies that manifested such indifference toward suicidal inmates. Finally, Plaintiff's allege that Defendants murdered McAtee and have conspired to cover up the murder. The intentional murder of a prisoner in custody would also raise an Eighth Amendment claim.

These Eighth Amendment rights were clearly established by June 2003. By then, it was clearly established law that a state official exhibits deliberate indifference by intentionally delaying medical treatment to an inmate despite being aware that the inmate has a life-threatening condition or an urgent medical situation that would be dangerously exacerbated by further delay. *See Thompkins v. Belt*, 828 F.2d 298, 301 (5th Cir. 1987); *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994). It was also clearly established in the Fifth Circuit and other jurisdictions in June 2003 that prison officials owe a constitutional duty to protect a prisoner with known or obvious suicidal tendencies from

self-inflicted harm.  *See Jacobs*, 228 F.3d at 393-94; *Lewis v. Parish of Terrebone*, 894 F.2d 142, 145 (5th Cir. 1990) ("One need not find a 'goose case' to imbue a warden at a jail with a constitutional duty to protect a prisoner prone to suicide from self-destruction."); *see also Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001); *Yellow Horse v. Pennington County*, 225 F.3d 923, 927 (8th Cir. 2000); *Ellis v. Washington County*, 198 F.3d 225 (6th Cir. 1999).  Plaintiff has also properly alleged a violation of the Eighth Amendment through her alternative claim of murder. It is beyond a doubt that the Eighth Amendment prohibits the intentional murder of an inmate by prison officials.

Lastly, Plaintiff contends that Williams, Blanford, and Taylor violated the Eighth Amendment when they intentionally stood-by and watched him hang, refusing to immediately enter the cell and rescue him.  This conduct, Plaintiff argues, was deliberately indifferent to McAtee's obvious medical needs.  Additionally, Plaintiff contends that defendant-supervisors Taylor, Treon and Johnson also acted with deliberate indifference by promulgating or enforcing a constitutionally-overbroad do-not-enter policy that did not permit officers to enter a cell under any circumstance, even when the officer actually knows that an offender, who does not pose a danger to officers, is committing suicide.  In this regard, Plaintiff contends that the prison policy itself is deliberately indifferent to the medical needs of suicidal inmates because it does not permit officers any discretion to enter a cell, even when they know – not merely suspect – that a harmless inmate is taking his own life.  Similarly, Plaintiff claims that Defendant Taylor, Treon, and Johnson exhibited deliberate indifference by failing to train their subordinates, like Officers Williams and Blanford, about how to properly respond to an inmate attempting to commit suicide in a manner that would avoid unnecessary delay in rescuing an inmate from certain death.

**I.      Claims Against Sergeant Taylor, Officer Williams, and Officer Blanford**

Officers Williams and Blanford claim to have summoned for a supervisor when they first became aware that McAtee was threatening to hang himself. However, their stories conflict regarding what they actually saw that justified calling a supervisor and what they did in the minutes between calling for a supervisor and Sergeant Taylor's arrival.

It is possible that a reasonable juror could infer from other circumstantial evidence in the record that Officers Williams and Blanford may have been aware that McAtee was in imminent danger of committing suicide but that they nevertheless acted unreasonably (i.e., with deliberate indifference to that risk) by not summoning a supervisor before he began to hang. Relevant to this determination is what Williams and Blanford actually saw and heard when they first interacted with McAtee and whether the officers truly believed that McAtee was hanging when they saw him with the noose around his neck before Taylor arrived.

For instance, Officer Williams testified at his deposition that he first summoned a supervisor when he finally saw McAtee hanging. At the time, he claims to have seen McAtee in the corner of his cell, facing away from him, "with his hands up around his neck." Once he saw that a ligature – "the string or sheet or rope, whatever it was"[6] – was tied around McAtee's neck, he shouted to the picket officer to summon ranking officers, nurses, and a video camera, all of which, he claims, arrived before Sergeant Taylor made the decision to enter McAtee's cell. This is corroborated by picket officer J. Rubenzer's incident report. In that report, Rubenzer claims that at approximately 6:20 p.m., Williams told him to call for "rank" because McAtee "had hung himself."

This version of the facts presumes that McAtee would have had to prepare a ligature,

---

[6]Williams was the officer who eventually cut the ligature. However, Williams' statements regarding whether the ligature was a sheet or piece of cloth are inconsistent.

properly tie it taut around the metal slats of the wall vent, and properly position himself into the noose, all within a brief minute-and-a-half period, a highly implausible proposition.  If anything, a jury might find the officers' accounts to be incredible and may determine that they actually saw McAtee making preparations but failed to do anything about it; instead they left him alone to prepare his demise and warned him that they would not enter the cell to rescue him under any circumstance.

A reasonable juror could also determine that Sergeant Taylor acted with deliberate indifference, watching McAtee hang himself while refusing to enter his cell immediately to save him and failing to call for medical assistance when McAtee's life-threatening situation became apparent. Sergeant Taylor claims that McAtee was still alive when Taylor arrived cell side and that after exchanging words with McAtee, McAtee hung himself.  However, Sergeant Taylor's story about how McAtee hung himself differs from another officer's who was at the scene. In fact, Taylor offers no explanation of how McAtee put himself into a position to hang from a vent in the ceiling even though Taylor claims to have watched him hang himself.

Sergeant Taylor claims to have entered the cell immediately, hand-cuffed McAtee, cut him down, and moved him onto the run outside his cell.  Taylor also claims to have immediately called for medical care, which in his story, arrived only minutes later.  However, no witness can explain how McAtee went from sliding his neck into a noose to immediate death.  Neither can anyone explain how McAtee's face became cyanotic, how clear fluids poured from his mouth, how he lost bowel control, and how his body became cool to the touch when, according to the guards' stories, he hung for only seconds and medical assistance arrived within a couple of minutes.

Under these inconsistent and incomplete facts, a reasonable jury could conclude that Taylor, Blanford, and Williams deliberately did not respond timely to McAtee's suicide threats, that they

delayed calling for medical help, and that the delay in entering his cell and calling for medical care

caused McAtee's death. The relevant historical facts pertaining to Sergeant Taylor, Officer Williams

and Officer Blanford are in dispute, and therefore, this case is appropriate to send to a jury.  *See*

*Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993) (citation omitted).   Credibility

assessments and choices between conflicting versions of events are ordinarily matters for a jury to

resolve, not the court on summary judgment.  *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir.

2002) (holding that in light of "several diametrically opposed summary judgment affidavits" on the

issue of probable cause, qualified immunity turned on fact issues that "must be resolved by further

proceedings in the trial court"); *see also*, *Athridge v. Rivas*, 312 F.3d 474, 478 (D.C. Cir. 2002);

*Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 621 (2d Cir. 1999); *Abraham v. Raso*, 183 F.3d 279, 287

(3d Cir. 1999) ("Cases that turn crucially on the credibility of witnesses' testimony in particular

should not be resolved on summary judgment."); *Pimentel v. U.S. Drug Enforcement Admin.*, 99 F.

Supp.2d 420, 431 (S.D.N.Y. 2000) ("The inconsistencies between the DEA's records and plaintiff's

account of the seizure can only be resolved based upon credibility assessments, which lie within the

exclusive province of the jury.").   This is especially true in this unique situation – where prison

employees are the only living witnesses to the relevant historical events of that day and, as named

defendants in the case, have a strong incentive to provide a misleading and unimpeachable factual

account.  *See, e.g., Bazan ex rel. Bazan*, 246 F.3d at 492 (citing *Reeves v. Sanderson Plumbing*

*Prods. Inc.*, 530 U.S. at 151).  In this situation, "[T]he court may not simply accept what may be a

selfserving account by the officer.  It must also look at the circumstantial evidence that, if believed,

would tend to discredit the police officer's story, and consider whether this evidence could convince

a rational fact finder that the officer acted unreasonably." *Abraham*, 183 F.3d at 294 (quoting *Scott*

*v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Because there are "multiple factual issues in dispute," the Court cannot determine at this juncture whether Sergeant Taylor, Officer Williams and Officer Blanford's conduct was objectively reasonable as a matter of law.  *See, e.g., Bazan ex rel. Bazan*, 246 F.3d at 492; *Gutierrez v. City of San Antonio*, 139 F.3d 441, 445-51 (5th Cir. 1998).  Accordingly, on Plaintiff's Eighth Amendment claim alleging that Defendants Taylor, Blanford, and Williams failed to properly react when finding McAtee hanging or attempting to hang himself, Defendants' motion for summary judgment is DENIED.

Despite construing the facts in the light most favorable to Plaintiff, the Court finds that Defendants Taylor, Williams and Blanford are entitled to summary judgment on Plaintiff's claim that, in spite of McAtee's threats of suicide, they placed him in an improperly-equipped administrative segregation cell.  There is no evidence in the record that indicates that any Defendant was responsible for the initial decision to send McAtee to Ad Seg or were even present while he was threatening to kill himself as he was being escorted away from the infirmary.[7]  There is also no evidence that any of Defendants participated in the decision to house McAtee in an improperly equipped cell or to give him the instrumentalities that he allegedly used to kill himself.[8]  There has

---

[7] The individual that was primarily responsible for the decision to send McAtee to administrative segregation – Captain Boyle – was not sued.  Officer Nunez was also not sued even though he was the individual who led McAtee away from the infirmary in handcuffs on his visibly lacerated wrists while he threatened to commit suicide.  None of the persons who overheard his threats to commit suicide – Captain Boyle, Nurse Newman, Officer Nunez, or any of the guards on staff in administrative segregation during McAtee's noisy escort – were sued.

[8] By contrast, there is evidence that the person (or persons) escorting McAtee to the administrative segregation cell were aware of McAtee's threats of suicide but nevertheless placed him the cell, which contained a bedsheet and a vent that could be used as a tying point for a makeshift noose.  Those individuals would have also noticed the visible hesitation cuts on McAtee's wrists since they first placed him in handcuffs in the infirmary and must have removed them sometime before placing him in his cell.  Yet, as stated previously, those individuals were not sued.

been an adequate time for discovery to proceed in this case, and to the extent that any such claim may have been viable, it was Plaintiff's burden to produce evidence through discovery to withstand summary judgment on the issue of qualified immunity.  Because Plaintiff has not provided any evidence that any of Defendants were personally involved in any of those relevant decisions, no genuine issue of material fact remains, and Defendants are entitled to judgment as a matter of law. Therefore, on Plaintiff's claims that Defendants Taylor, Blanford, and Williams failed to protect McAtee from a known or obvious risk of suicide, placing McAtee in an improperly equipped cell or failing to remove dangerous objects from his cell, the Court GRANTS Defendants' motion for summary judgment.

The Court also GRANTS Defendants' motion for summary judgment on Plaintiff's claim that Defendants murdered McAtee.  It is true that the record before the Court raises serious questions about how and when McAtee died.  However, Plaintiff has presented the Court with nothing more than doubts about the prison officials' explanations regarding how and when McAtee committed suicide, what different guards witnessed, and what instrument was used in hanging McAtee. Although those doubts will be relevant to a jury's credibility determinations regarding Plaintiff's Eighth Amendment claims, they are not enough to support a claim that Sergeant Taylor, Officer Williams, and Officer Blanford actually intentionally murdered McAtee.


ii.      **Claims Against Gary Johnson and Warden Treon**

It is well settled law that supervisory personnel like Warden Treon and Executive Director Johnson cannot be held vicariously liable under §1983 for the acts of their subordinates under the theory of respondeat superior.  *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978).

Rather, to state a valid claim against a supervisory official like Treon and Johnson, a plaintiff must establish a causal connection between the acts or omissions of the defendant and the resulting constitutional deprivation. *See, e.g., Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995) (per curiam); *Reimer v. Smith*, 663 F.2d 1316, 1323 (5th Cir. 1981).

An inmate seeking to hold a supervisor liable for deliberate indifference to the inmate's medical needs may show that the supervisor "promulgated or failed to promulgate policies" that manifested deliberate indifference toward the serious medical needs of prisoners or detainees. *Thompson v. Upshur County*, 245 F.3d at 459. A supervisor may also be held liable under §1983 for failure to properly supervise and train subordinate officers who cause a deprivation of constitutional rights. *Wever v. Lincoln County*, 388 F.3d 601, 606-07 (8th Cir. 2004). The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. *Id.* This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. *Id.*

Plaintiff contends that Treon and Johnson are not entitled to qualified immunity because they acted in an objectively unreasonable manner by adopting or enforcing a constitutionally-defective "do-not-enter" policy that "directly [e]nsured" McAtee's death. Plaintiff argues that the policy was constitutionally overbroad since it did not grant low-level prison officers the discretion to open a cell door to rescue a dying inmate under any circumstance, even if the officer was accompanied by other officers and was certain that rescuing the inmate would not pose a threat of danger. In this regard, Plaintiff contends that the prison policy itself is deliberately indifferent to the medical needs of suicidal inmates like McAtee because it does not permit officers any discretion to enter a cell in an emergency situation, if they desire to do so. Instead the policy requires the officer to wait for a

supervisor's approval and a team of officers to enter, whatever the circumstances.

Even if the Court were to assume for the sake of argument that the TDCJ do-not-enter policy was unconstitutional or that it was unconstitutionally applied at the time of McAtee's death, there is absolutely no evidence that Treon or Johnson were in any way responsible for promulgating or enforcing the policy with respect to McAtee. Officer Williams testified at his deposition that a TDCJ training video instructs officers about the proper protocol when encountering an inmate that appears to be hanging.  Williams claims that he was forewarned that inmates may stage a suicide attempt in order to assault prison staff when they enter the cell.  Therefore, to ensure officer safety, he claims that he was told to always summon a supervisor for permission to enter a cell and to await a team of officers before entering.  Yet, Plaintiff has failed to present any evidence that either Treon or Johnson designed the policy, approved it, or were even aware of it.  In fact, the policy is not even contained in the evidentiary record.  *Cf. Thompson*, 245 F.3d at 459; *Wever*, 388 F.3d at 606-07.

More fundamentally, there is no evidence in the record that Treon or Johnson's conduct or the policy itself caused McAtee's death.  In fact, no witnesses claim that they were delayed in entering McAtee's cell after his hanging due to the policy.  The policy was never used as a reason that entry was delayed.  Instead, the guards deny that they delayed at all in entering McAtee's cell once McAtee began to hang.  In the absence of such evidence, the Court GRANTS Defendants Treon and Johnson's motion for summary judgment on Plaintiff's §1983 claims.  *See Wagner v. Bonner*, 621 F.2d 675, 679 (5th Cir. 1980) (requiring a §1983 plaintiff to "establish a causal connection between an act of the supervisory official and the alleged constitutional violation").

**b.      Fourteenth Amendment**

In her complaint, Plaintiff also contends that the Defendants violated McAtee's Fourteenth Amendment substantive due process "right to life." She asserts that the defendants also violated McAtee's substantive due process rights when they affirmatively placed him in a "state-created danger" by transferring him – a known suicidal inmate who had been threatening to commit suicide during transport – into an improperly equipped administrative segregation unit. Also, Plaintiff contends that Defendants breached the "special relationship" that exists between an inmate and a guard by failing to rescue McAtee as he hung, an act which she also contends independently shocks the conscience. Lastly, Plaintiff argues that Defendants violated her own substantive due process rights by severing her parental relationship with her child.

Even assuming the truth of Plaintiff's allegations, she cannot state a claim under the Fourteenth Amendment because McAtee was an incarcerated prisoner at the time of the alleged constitutional violations. As an initial matter, the Supreme Court "has always been reluctant to expand the concept of substantive due process." *Collins*, 503 U.S. at 125. For that reason, when an explicit textual provision of the Constitution protects against the challenged government action, the claim alleged should be analyzed under that specific provision alone and not under the more general guarantee of substantive due process. *See Armendariz v. Penman*, 75 F.3d 1311, 1328 (9th Cir. 1996) (*en banc*).

With respect to the prison setting, the Supreme Court has held that the Fourteenth Amendment due process clause does not afford a convicted prisoner any greater protection than the Eighth Amendment's cruel and unusual punishment clause. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("Any protection that 'substantive due process' affords convicted prisoners . . . [is] at best redundant of that provided by the Eighth Amendment."); *Whitley v. Albers*, 475 U.S. 312, 327

30

(1986) ("It would indeed be surprising if . . . conduct that shocks the conscience or afford[s] brutality the cloak of law, and so violates the Fourteenth Amendment, were not also punishment inconsistent with contemporary standards of decency and repugnant to the conscience of mankind, in violation of the Eighth [Amendment].")(internal citation omitted).  For that reason, the Fifth Circuit has held that the Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners . . . [and] controls over more generalized notions of substantive due process." *Austin v. Johnson*, 328 F.3d 204, 210 n.10 (5th Cir. 2003) (internal citations omitted).  Because Plaintiff's allegations on behalf of McAtee may only be brought under the Eighth Amendment, she cannot state a claim under the Fourteenth Amendment on behalf of McAtee.  Instead, the Court has construed her allegations accordingly under the Eighth Amendment.

To the extent that Plaintiff has alleged that defendants have violated **her** constitutional rights as a parent, the rights that she asserts do not apply in this situation.  The cases that she relies upon pertain to limited situations involving the state's ability to interfere with parental education of children and the right to interfere with the right to family association.   Those cases do not carve out a right for every affected parent to bring a constitutional claim against state officials for harm to their adult, incarcerated children.  As a parent, Plaintiff's only recourse is provided by state tort law in a wrongful death action.  For that reason, Defendants' motion for summary judgment on that lone claim is hereby GRANTED.

B.      **State Law Claims**

Plaintiff brought claims against all Defendants based on state law negligence and negligence per se.  Plaintiff claims that (1) Defendant Treon failed to screen, train and supervise State

31

employees; (2) Defendant Johnson promulgated a policy that prevented a floor guard from entering a cell to save the life of an inmate who was hanging; (3) Defendant Treon enforced a policy that prohibited guards from taking proper steps to prevent McAtee's death; (4) Defendants Johnson and Treon furnished McAtee with instruments that were unsafe for a potentially suicidal inmate; (5) Defendants Williams, Blanford and Taylor failed to implement policies that would have prevented McAtee from having a dangerous instrumentality in his cell; (6) Defendants Treon and Johnson failed to train employees properly which led to McAtee being put in an Ad Seg cell rather than a cell in the medical department; (7) all Defendants failed to provide safe and appropriate conditions of confinement; (8) and Defendants Johnson and Treon failed to adopt or enforce policies governing the humane treatment of inmates, including the separation and classification of inmates.

### 1.        Eleventh Amendment Immunity

Many of Plaintiff's negligence claims are worded as if she is suing TDCJ itself or Defendants in their official capacities.   For example, Plaintiff uses the term "the State" interchangeably with Defendants when discussing Defendants' negligence.   Plaintiff's Third Amended Complaint includes language such as, "The Defendant State effectively permitted a condition to exist whereby Richard McAtee had access to cloth, sheet, rope . . . ," and "Defendant State's negligence in placing Richard Lee McAtee in the wrong cell and standing by and watching while he hung to death was a proximate cause of the injuries and damages claimed herein."

To the extent that Plaintiff's claims are claims against TDCJ or Defendants in their official capacities, Plaintiff's claims are barred by the Eleventh Amendment.   *Sherwinski v. Peterson,* 98 F.3d 849 (5th Cir. 1996).

### 2.    Official Immunity

To the extent that Plaintiff's state law claims attempt to hold Defendants liable in their individual capacities, they are entitled to official immunity from suits arising from the performance of their (1) discretionary duties in (2) good faith as they are (3) acting within the scope of their authority. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex. 1994). Plaintiff's negligence claims are unsupported by any summary judgment evidence. Plaintiff failed to provide the Court with any evidence that these Defendants were personally involved in any policy-making or training. Plaintiff also failed to present any evidence that these Defendants had any special knowledge concerning McAtee and his suicidal propensities.

Therefore, the Court GRANTS summary judgment for Defendants on all of Plaintiff's state law negligence and negligence per se claims.

### III.  CONCLUSION

The conflicting scenarios described in the evidentiary appendix convinces the Court that reasonable jurors could disagree about genuine issues of material fact pertaining to the manner in which Defendants Williams, Blanford, and Taylor interacted with Richard Lee McAtee. Ultimately, a jury must decide what actually occurred on the day of McAtee's death, and this determination is relevant, if not dispositive of whether Defendants are entitled to qualified immunity. Accordingly, the Court **DENIES** Defendants Williams, Blanford, and Taylor's motions for summary judgment on Plaintiff's Eighth Amendment claim under 42 U.S.C. § 1983 (that Defendants failed to properly react to abate the risk of death once they discovered that McAtee was either hanging or attempting

to hang himself) and GRANTS summary judgment on all other claims brought by Plaintiff.

Defendants Treon and Johnson's motions for summary judgment are **GRANTED** in their entirety.

**IT IS SO ORDERED**

**ENTERED: October 10, 2006**

_____
**JUDGE JERRY BUCHMEYER**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**